# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * Case No.: RWT 10cr0029 |
| MARCUS HERMAN MORRIS. | * |

## MEMORANDUM OPINION

Defendant Marcus Herman Morris is charged with possession of a firearm after having been convicted of a felony, in violation of Title 18 United States Code § 922(g). On June 28, 2010, Morris moved to suppress all evidence seized pursuant to the search of his person, including the loaded firearm, arguing that it was obtained in violation of his rights under the Fourth Amendment. Morris concurrently moved to suppress all statements, arguing that they were obtained by exploitation of the illegality of the stop and frisk and were potentially obtained in violation of the Fifth and Sixth Amendments and his *Miranda* rights. The Court conducted a hearing on Morris' motions to suppress on October 20, 2010. For the reasons that follow, both motions to suppress shall be denied.

## FACTUAL BACKGROUND

During the early morning hours of September 10, 2009, Morris was riding a bicycle on the 5700 block of Walker Mills Rd., in Prince George's County, Maryland. Detective Juan Nolesco testified that he was patrolling this high crime area at the time in an unmarked police car as part of his duties as a member of the Special Assignment Team of District Three of the Prince George's County Police Department. At approximately 1:30 a.m., Nolesco noticed Morris riding

his bicycle in the middle of the four lane roadway, veering in between lanes and crossing the center line into oncoming traffic. Nolesco's unmarked police car and Morris' bicycle were the only vehicles traveling in this area of Walker Mill Road at the time. Nolesco continued driving his car and Morris once again veered his bicycle into Nolesco's oncoming traffic lane. In order to avoid a head on collision, Nolesco was forced to veer his vehicle out of the path of the bicycle.

After Morris passed behind his vehicle on the bicycle, Nolesco made a "U-Turn" and activated his emergency flashing lights. Morris stopped riding his bicycle and stood straddling his bicycle on the sidewalk. Nolesco pulled up approximately four or five feet from Morris, rolled down his driver's side window, and asked Morris if he was "o.k." Morris did not respond. Nolesco noticed Morris was wearing all black clothing, including a thick Northface jacket.

Nolesco asked for identification and started to exit his vehicle. When he was approximately halfway out of his vehicle, Morris threw the bicycle at Nolesco and started running. As Nolesco was still attempting to exit his vehicle, and after Morris threw the bicycle and started running, Nolesco attempted to restrain and patdown Morris as he ran away. Nolesco was unsuccessful in his attempt to restrain and patdown Morris, but he "probably" made at least minimal physical contact with Morris at this point.

After Nolesco's failed attempt to restrain Morris, Morris continued to run, clutching his waistband as he ran. Nolesco pursued Morris on foot and pulled his service weapon after he observed Morris reach into his waistband. Nolesco shouted for Morris to stop and show him his hands or he would shoot. Shortly after Nolesco drew his service weapon, Morris turned around and stopped running, still reaching into his waistband. Morris then held both of his hands up and sunk to the ground. Nolesco had Morris lay on the ground as he was handcuffed. Without questioning, Morris stated "I just found it, you can have it," or some slight variation on that

statement. A patdown revealed a fully loaded .40 caliber pistol, in a holster, tucked in Morris's waistband.

Morris was arrested and transported to the police station, where he made a written statement. Before making the statement, he was orally advised of his *Miranda* rights and given an 'advice of rights' form. Morris stated that he understood his rights, wished to make a statement without a lawyer, had not been promised anything, and was not under the influence of alcohol or drugs. Morris wrote a page long statement admitting to possessing the firearm, as well as veering his bicycle into oncoming traffic in front of Nolesco.

## **ANALYSIS**

Morris moves the Court to suppress all evidence seized pursuant to the search of his person on September 10, 2009, including the loaded firearm. Morris argues that the evidence was obtained in violation of his Fourth Amendment rights because Nolesco did not have a reasonable, articulable suspicion that he was in danger when Nolesco initially attempted to patdown Morris before the foot chase. Morris also moves to suppress all statements, arguing that they were (1) obtained by exploitation of the illegality of the stop and frisk, and (2) potentially obtained in violation of the Fifth and Sixth Amendments and his *Miranda* rights.

The Government bears the burden of proving, by a preponderance, the legality of the search and seizure of evidence which it intends to introduce at trial. *See United States v. Mendenhall*, 446 U.S. 544 (1980); *Nix v. Williams*, 467 U.S. 431, 444 (1984).

I. **Motion to Suppress Evidence**

   A. **Timing of the Initial Seizure of Defendant**

The first issue presented is at what point Morris was seized during the exchange between Morris and Detective Nolesco, thereby triggering the protections of the Fourth Amendment. A

suspect is not "seized" within the meaning of the Fourth Amendment until officers apply physical force or the suspect submits to a show of authority. *United States v. Smith*, 396 F.3d 579, 587 (4th Cir. 2005) (citing *California v. Hodari D.,* 499 U.S. 621, 626 (1991)). A suspect is seized upon "the laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *See Hodari D.* 499 U.S. at 625; *See also United States v. Hammond*, No. 99-0073, 2000 WL 1139611, at *2 (4th Cir. Aug 11, 2000) (concluding that if the police officer grabbed the defendant before he started to run, an arrest occurred).

The Government contends that Morris was not seized within the meaning of the Fourth Amendment until after Morris stopped fleeing from Detective Nolesco, thereby submitting to his show of authority. Morris argues that he was seized before the foot chase ensued, at the latest when Nolesco attempted to exit his car and pat him down.[1]

While the Court credits Nolesco's testimony that he "probably" made physical contact with Morris as he attempted to exit his vehicle, any such contact was made only after Morris "threw the bike" and "was already on the run." Nolesco testified that the contact was both in the form of an attempted patdown of Morris and an attempt to restrain him from fleeing. Although Nolesco's testimony was less than clear on this point, the Court concludes that Nolesco applied some degree of physical force, albeit slight, in an effort to patdown and restrain Morris after Morris threw his bike at him and began to run. This physical force, however slight, constitutes a seizure within the meaning of the Fourth Amendment. *See Hodari D.*, 499 U.S. at 625.

**b. Lawfulness of the Initial Seizure**

The next issue is whether this initial seizure was lawful. Morris concedes, and the Court agrees, that Nolesco was justified in performing an investigative stop of Morris because he had

---

[1] The Court need not consider whether Morris was seized prior to the attempted patdown because, as Defense counsel conceded at the Suppression Hearing, the initial investigatory stop was lawful and only the lawfulness of the attempted patdown or frisk is in dispute.

probable cause to believe Morris committed traffic violations. Morris argues, however, that Nolesco's attempted patdown or frisk of Morris prior to the foot chase was unlawful.

### i. Lawfulness of the Stop

"If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United* States, 517 U.S. 806, 810 (1996) (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979)). Maryland Transportation Code § 21-1202, provides that "every person operating a bicycle or a motor scooter in a public bicycle area has all the rights granted to and is subject to all the duties required of the driver of a vehicle by this title." Md. Transportation Code Ann. § 21-1202 (2010) (emphasis added); *See also Cox v. State of Maryland*, 161 Md. App. 654, 657-59 (Md. Ct. Spec. App. 2005) (concluding that police officers had reasonable suspicion to conduct traffic stop of defendant after the officers observed him riding a bicycle in the wrong direction on a one-way street).

Maryland Transportation Code § 21-301(c)(1), provides: "On any roadway that is divided into four or more clearly marked lanes for vehicular traffic and that provides for two-way movement of traffic, a vehicle may not be driven on the left of the centerline of the roadway," except under specified circumstances not present in this case. *See* Md. Transportation Code Ann. § 21-301(c)(1) (2010). Detective Nolesco observed Morris riding a bicycle in the middle of a four lane roadway and twice crossing the center line into oncoming traffic. Therefore, Nolesco conducted a lawful investigatory stop because he had probable cause to believe Morris had committed traffic violations while riding his bicycle in this manner.

### ii. Lawfulness of the Attempted Frisk

In *Terry v. Ohio* 392 U.S. 1 (1968), the Supreme Court recognized that

> there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id*. at 27 (internal citations omitted); *see also United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998) ("Police may conduct a patdown search without a warrant if, under the totality of the circumstances, the officer has an articulable, reasonable suspicion that a person is involved in criminal activity and that he is armed.... If a reasonably prudent person would believe that his safety, or the safety of others, is endangered, he may conduct a limited search of outer clothing to discover any weapons." (internal citation omitted)).

Here, Detective Nolesco initially stopped Morris after observing him riding his bicycle in the middle of the roadway, twice crossing the center line, and eventually almost striking his vehicle. As discussed above, Nolesco was authorized to perform an investigative stop at this point because he had probable cause to believe Morris had committed traffic violations. Even if Nolesco did not have a reasonable suspicion for a *Terry* frisk at that time, when Morris unexpectedly and suddenly threw his bike at him and began to run in response to Nolesco's questions, "the circumstances evolved to present a much more suspicious and dangerous climate." *See United States v. Jones*, 233 F. App'x. 273, 278 (4th Cir. May 24, 2007) (concluding that, even if the officer didn't initially have reasonable suspicion for a *Terry* stop, when the suspect "unexpectedly and suddenly jumped from the vehicle in response to [the

officer's] questions, the circumstances evolved to present a much more suspicious and dangerous climate").

Detective Nolesco observed Morris riding his bicycle erratically, in a deserted high crime area, late at night. When Nolesco stopped Morris and asked him if he was "ok," Morris was unresponsive. Nolesco also observed that Morris was wearing all black, including a thick Northface jacket that, based on his experience, he viewed to be unseasonably warm and the type of clothing that people usually wear to hide or conceal weapons. When, in response to an innocuous question, Morris unexpectedly threw his bike at him and tried to flee, the totality of the facts known to Nolesco combined to create a reasonable, articulable suspicion that Nolesco was in danger and that Morris was armed and dangerous. Given the totality of the circumstances, Nolesco was justified in attempting to restrain Morris and conduct a patdown search for weapons before the foot chase ensued.

After Morris escaped Nolesco's grasp and continued to flee while clutching his waistband, Detective Nolesco's already reasonable, articulable suspicion that Morris was armed and dangerous was only further substantiated. In view of the totality of the circumstances, Nolesco had probable cause to arrest Morris at this point. Accordingly, the patdown revealing the loaded firearm, which occurred after the foot chase and after Morris was already in handcuffs, was also lawful.

## II. Motion to Suppress Statements

Finally, the Court also rejects Morris' argument that it should suppress his post-arrest statements as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal quotation marks omitted). As explained above, in view of the totality of the circumstances, the initial stop and attempted frisk and subsequent search incident to arrest, were

not violative of Morris' Fourth Amendment rights. This conclusion, in turn, forecloses the argument that Morris' statements were fruits of Nolesco's unlawful action. *See Id*. at 484.

To the extent Morris still contends that his statements were involuntary, this argument fails as well. Morris' initial statement to Nolesco is not barred by the Fifth Amendment because it was a spontaneous statement uttered without provocation and not the product of interrogation. *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993). Morris' subsequent written confession is not barred because Morris was advised of his Miranda rights and waived them. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).

## **CONCLUSION**

In light of the above analysis, Morris' Motion to Suppress Evidence and Motion to Suppress Statements shall be denied. A separate Order follows.


November 1, 2010　　　　　　　　　　　　　　　　/s/
Date　　　　　　　　　　　　　　　　　ROGER W. TITUS
　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE