1          UNITED STATES DISTRICT COURT FOR
              THE DISTRICT OF MARYLAND
2

3    ---------------------------x
     UNITED STATES OF AMERICA,   :
4              Plaintiff         :
                                 :
5                                :
     vs                          :Criminal Action: RWT-10-029
6                                :
     MARCUS HERMAN MORRIS,       :
7              Defendant.        :
     ---------------------------x
8

9                         Wednesday, October 20, 2010
                          Greenbelt, Maryland
10

11

12       The above-entitled action came on for a
     Suppression Hearing Proceeding before the HONORABLE ROGER
13   W. TITUS, United States District Judge, in courtroom 2C,
     commencing at 8:36 a.m.

14

15

         APPEARANCES:
16

17       On behalf of the Plaintiff:

18       KEVIN ROSENBERG, Esquire

19

20       On behalf of the Defendant:

21       JULIE L.B. JOHNSON, Esquire

22

23

24

25   Tracy Rae Dunlap, RPR, CRR          (301) 344-3912
     Official Court Reporter

1                              **I N D E X**

2                    <u>DIRECT</u>   <u>CROSS</u>     <u>REDIRECT</u> <u>RECROSS</u>

3   Juan Nolasco...........4.........17.........33.....38

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                              <u>Page</u>

24   Reporter's Certificate.......................60

25

Direct - Nolasco

1          MR. ROSENBERG:  Your Honor, calling case number

2  RWT-09-0029; United States of America versus Marcus

3  Morris.  Your Honor, Special Assistant United States

4  Attorney Kevin Rosenberg on behalf of the government.

5          THE COURT:  Good morning.

6          MS. JOHNSON:  Good morning, Your Honor.  Julie

7  Johnson from the Federal Public Defenders' office on

8  behalf of Marcus Morris, who is present.

9          THE COURT:  Good morning.  All right.  We're here

10  on a Motion to Suppress.  Let me hear any testimony

11  that's going to be offered with respect to that, and then

12  I'll hear your argument.

13          MR. ROSENBERG:  Thank you, Your Honor.  Before you

14  came out and took the bench, I actually made a request

15  for a few minutes for my testifying officer to grab one

16  thing from his file in his car in the parking lot.

17          THE COURT:  Okay.  How long is that going to take?

18          MR. ROSENBERG:  My guess would be that he would be

19  back in two to three minutes.  It's just in the parking

20  lot.

21          THE COURT:  Okay.  Well, then why don't I go back

22  off the bench and you tell me when he's here?

23          MR. ROSENBERG:  Thank you, Your Honor.  I

24  apologize.

25          THE COURT:  Unless you've got some other witness.

Direct - Nolasco

1          MR. ROSENBERG:  No, Your Honor.  It's just the one

2  witness.

3          THE COURT:  Okay.  Well, call me when you're

4  ready.

5                  (Off the record at 8:37 a.m.)

6                  (On the record at 8:43 a.m.)

7          THE COURT:  You may proceed.

8          MR. ROSENBERG:  Thank you, Your Honor.  The

9  government calls Detective Juan Nolasco to the stand.

10          THE CLERK:  Please raise your right hand.

11                  (Witness duly sworn at 8:44 a.m.)

12          THE CLERK:  Please be seated in the witness chair.

13          Speak loudly and clearly into the microphone,

14  please.  State your full name for the record.

15          THE WITNESS:  Juan Nolasco.  J-U-A-N

16  N-O-L-A-S-C-O.

17          THE CLERK:  Thank you.

18                       **DIRECT EXAMINATION**

19          BY MR. ROSENBERG:

20  Q.    Good morning, sir.

21  A.    Good morning.

22  Q.    Where do you work, sir?

23  A.    I work for the District Special Assignment Team

24  for Prince George's County Police Department.

25  Q.    What is your current rank?

Direct - Nolasco

A.      PFC.

Q.      What does that stand for?

A.      Private First Class.

Q.      How long have you been a police officer?

A.      Four and a half years.

Q.      And are you with any special unit?

A.      That's correct.  Special Assignment Team out of
District Three.

Q.      What's the Special Assignment Team?

A.      We're part of the detective bureau.  We
concentrate in high crime areas, drug arrests and gun
arrests.

Q.      And what type of -- what type of assignments do
you get in the high crime areas?

A.      We do saturation patrol, surveillance, jump-outs,
interdiction.

Q.      What does that mean, "jump-outs" and
"interdiction" and "saturation?"

A.      Saturation means that if an area is a high crime
area, we'll go in and saturate it with different types of
vehicles.  We'll pretty much put about -- anywhere
between 10 to 15 officers in the area, and we'll try to
make as many arrests as we can, you know, depending on
what kind of a crimes are being committed in the area, in
order to get information on other type crimes.

Direct - Nolasco

1  Q.     How is it determined what areas your unit will be

2  surveilling?

3  A.     By the amount of calls that we get to that area.

4  Q.     All right.  Now, do you remember -- were you also

5  on the force on December 10th 2009?

6  A.     Yes, sir.

7  Q.     Okay.  Do you remember arresting a Marcus Morris?

8  A.     Correct.

9  Q.     Can you explain to the Court what your assignment

10 was that night?

11 A.     It was Walker Mill Road, in the Silver Hill area.

12 Simply, I was just driving around patrolling, road

13 patrol, high visibility patrol.  Just driving through the

14 area.

15 Q.     What type of area is this?

16 A.     It's an area known for a lot of violent crime,

17 shootings, robberies, drugs.

18 Q.     And how is it known for shootings, robbery, drugs?

19        Why do you say that?

20 A.     We've had plenty of them.  Just this year alone we

21 had a -- actually, last year we had a juvenile actually

22 get shot in that area.

23 Q.     All right.  Have you made any arrests in that area

24 before the date in question?

25 A.     Yes.

Direct - Nolasco

1  Q.     Have you made any firearm arrests?

2  A.     Yes.

3  Q.     Are you able to estimate how many arrests you've

4  made in that area?

5  A.     I can tell you that my team alone has made

6  numerous arrests in that area.

7  Q.     What do you mean by numerous?

8  A.     It would be hard.  This year alone we've recovered

9  about 90 weapons off the streets, and I can say that a

10 lot of those have come from that area.

11 Q.     Have you made any drug -- controlled substances or

12 drug arrests in that area?

13 A.     Yes.

14 Q.     What about any arrests for violent offenses?

15 A.     Yes.

16 Q.     So when you're traveling in that area, do you have

17 a heightened sense of safety concerns?

18 A.     Correct.

19 Q.     Is that opposed to other areas?  Or, why would you

20 say that?

21 A.     It's just a violent place and it's known for it.

22 Q.     All right.  Okay.  At some point that night, did

23 you come in contact with a Marcus Morris?

24 A.     Yes, I did.

25 Q.     Can you explain how that happened?

Direct - Nolasco

1  A.     First, I observed the amount of distance.  He was

2  riding a bike in the middle of Walker Mill Road,

3  zigzagging in between lanes, oncoming and outgoing

4  traffic.

5  Q.     When you say "Walker Mill Road," can you describe

6  what kind of road that is?

7  A.     It's a four-lane.  Two lanes one way, two lanes

8  the other way.  It's four lanes not divided by a median.

9  Q.     What's the speed limit on that road?

10  A.     I believe it's about 35 or 40.

11  Q.     What time of night or day did you encounter him?

12  A.     It was night.  It was nighttime.  I don't recall

13  the exact time.

14  Q.     Are you able to estimate a time?

15  A.     I want to say probably around one.  Maybe 12:30,

16  one in the morning.

17  Q.     So that would be one -- 12:30 or one a.m.?

18  A.     A.m.  Correct.

19  Q.     What's the lighting like on this road?

20  A.     Artificial lighting.  There are some light poles,

21  but it's -- it looks quite dark.

22  Q.     Are you in a one-man or a two-man car?

23  A.     I'm in a one-man unit in an unmarked vehicle.

24  Q.     And is there a difference between an unmarked

25  vehicle and an undercover vehicle?

Direct - Nolasco

1  A.     An undercover could be a leased vehicle; it could

2  be a rental car vehicle.  An unmarked has lights, it has

3  a radio, it has a computer installed in it and so on and

4  so forth.

5  Q.     How were you dressed this night?

6  A.     I have a jacket, a vest that says "POLICE" on it,

7  and I have my uniform, my blue uniform, is underneath.

8  Q.     So when do you see Marcus Morris?

9  A.     I see him at a distance.  All I see him, it's

10 going -- coming in and out of the lanes, at which point

11 my first thought is I know that he sees me coming because

12 I have lights on my vehicle, the headlights.  So I'm

13 expecting him to get out of the way at some point, but he

14 just doesn't.

15 Q.     How far away could you see him?

16 A.     I was heading towards, I don't know, say about

17 30'.

18 Q.     Okay.  How many times did you see him pass into

19 the oncoming traffic lane on his bicycle?

20 A.     Twice.

21 Q.     What happens when you approach him on your --

22 A.     I kept going in my normal lane because I figured,

23 you know, if I try to make any movements right now I

24 might hit him.

25        And eventually, towards the -- right when I'm

Direct - Nolasco

1 about to, like, strike him, he actually gets out of the

2 way and goes back on to the sidewalk.

3 Q.      All right.  So what do you do at this point?

4 A.      At this point I, made a U-turn, flipped my lights,

5 and come back towards him.

6 Q.      All right.  And how do you come back towards him?

7 A.      I made a U-turn, and I stopped the cruiser.  He

8 was in the opposite direction.  So at this point, I'm on

9 the opposite side of the road with my emergency equipment

10 on and I'm stopped parallel to him, where I begin to ask

11 him questions.

12 Q.      When you're stopped parallel to him, are you

13 speaking to him through the passenger side window or

14 through the driver's side window?

15 A.      Through the driver's side window.

16 Q.      At this point, do you have your lights and sirens

17 on?

18 A.      Just the lights.

19 Q.      Where is he at this point?

20 A.      He is right next to me on his bike, just sitting

21 there.

22 Q.      And where are you at this point?

23 A.      Still in the car talking to him.  I asked him,

24 like, are you okay?  You know, my first thought of him

25 was that he might be drunk or on some type of substance.

Direct - Nolasco

1  Q.      Why would you think that?

2  A.      Because it's not normal for somebody to drive a

3  bicycle like that in the middle of the road.

4  Q.      At what time of night, again, was this?

5  A.      At one o'clock in the morning.

6  Q.      Did he respond to you when you asked if he was

7  okay?

8  A.      No.  He was -- he just was stuck; wouldn't say

9  anything.  I asked him what his name was, asked him if he

10 was okay, and the only response I got from him was "uh."

11 So at this point, I decided to step out of the vehicle.

12 I said, why don't you come over here and let me see if

13 you have any ID on you.  And when I attempted to try to

14 pat him down, he threw the bike at me and takes off

15 running, reaching into his waistband.

16 Q.      When you say that you stepped out of the vehicle

17 and then attempted to pat him down, can you explain at

18 what point he threw the bike and started to run?

19 A.      As soon as I opened the door and I tried to, like,

20 step out, I saw the bike coming at me.

21 Q.      Okay.  So, were you able to get completely out of

22 the vehicle before the bike came at you?

23 A.      I think I was, like, halfway in and out.  I don't

24 recall exactly.

25 Q.      Do you remember what Mr. Morris was wearing that

Direct - Nolasco

1  day?

2  A.     Yes.  He had a thick North Face jacket on -- I

3  think it had some lettering on it -- a cap and, I

4  believe, black pants.

5  Q.     So were you close enough to him to be able to

6  notice what type of clothing he was wearing?

7  A.     Yes.  At that point, yes.

8  Q.     What month was this again?

9  A.     September, I believe, or October.

10  Q.     All right.  Would this type of thick North Face

11  jacket give you any cause for concern, given the month

12  that it was in?

13  A.     Yes.  It wasn't that cold, I remember that.  And I

14  know that based on my training and experience, I know

15  that people usually wear that type of clothing to hide or

16  conceal weapons or drugs.

17  Q.     Okay.  And did you come to that conclusion in a

18  combination of the fact that it was -- the neighborhood

19  that you were patrolling?

20  A.     Correct.  Once he reacted in the manner that he

21  did and started running and reaching into his waistband,

22  yes, I believed that he was possibly armed.

23  Q.     When you say reaching into his waistband, what was

24  he doing?

25  A.     He was lifting his jacket and digging into his

Direct - Nolasco

1  waistband, which actually put me in fear for my life and

2  caused me to draw my weapon.

3  Q.      Which hand was he using to dig into his waistband?

4  A.      I believe his right hand.

5  Q.      Now, when you say that he threw his bike and

6  started to run, can you describe how he started to run?

7  A.      Fast.

8  Q.      Which direction?

9  A.      Well, the same direction that both of our vehicles

10 were facing at the point.  So, away from the cruiser

11 towards -- I forget what the name -- what road that is,

12 but I believe it is Rolling Road.

13 Q.      What was that?

14 A.      I believe he was running towards Rolling Road.

15 It's like the next block over.

16 Q.      Did you have a chance to call for backup at this

17 time when he started to run?

18 A.      No, not at this time.  Because he was reaching

19 into his waistband at that time, the only thing I was --

20 I could think of was he's definitely trying to grab

21 something out of his waistband, and I wasn't sure if he

22 was trying to get a tactical advantage on me.  So at that

23 point I decided to go after him.

24 Q.      How long into the foot chase did you pull your

25 service weapon?

Direct - Nolasco

1  A.      Immediately.  As soon as I saw him reach into his

2  waistband.

3  Q.      Were you saying anything to him?

4  A.      Yes.  I told him that he needed to stop and show

5  me his hands or that I would shoot him.

6  Q.      And what did he do?

7  A.      He turned around towards me and was still reaching

8  into his waistband until, finally, he brought both of his

9  hands up and went down to the ground, at which point he

10 was taken into custody.

11 Q.      Now, how many -- how long would you say that the

12 foot chase lasted?

13 A.      A short -- I couldn't tell you.  Maybe less than a

14 minute.

15 Q.      Okay.  Would you be able to estimate feet or

16 yards?

17 A.      Maybe anywhere from 15' to 20'.

18 Q.      Feet or yards?  Which?

19 A.      Feet.

20 Q.      What did he do once he stopped?

21 A.      Once he went down to the ground and I was placing

22 him into handcuffs, and he kept saying, "You can have it.

23 You can have it.  Just take it.  Just take it."

24 Q.      Did you follow up on those statements?

25 A.      I had no clue what he was talking about.  But when

Direct - Nolasco

1  I reached into his waistband, I felt the gun and at that

2  point I put two and two together.

3  Q.    Why did you reach into his waistband?

4  A.    Because that's where he was reaching for at the

5  beginning of the chase, so I figured I might as well make

6  sure that he doesn't have a weapon on him or something

7  like that.  But at that point I have him restrained.  So

8  at this point, yes, I'm reaching into his waistband and

9  making sure.

10 Q.    What did you find in his waistband?

11 A.    It was .40 Caliber handgun in a holster.

12 Q.    Did it have any ammunition in it?

13 A.    Yes.  It was fully loaded.

14 Q.    What did you do once you found the firearm in his

15 waistband?

16 A.    Once I found the firearm in his waistband, I made

17 it safe, and I called for backup.

18 Q.    Do you eventually take him to the police station?

19 A.    Yes.  He was taken down to the District Three

20 station, where he waived his rights and gave us a written

21 statement.

22 Q.    I'm going to show you what's been marked as

23 Government's Exhibit No. 1.

24       Do you recognize this document, officer?

25 A.    Yes.

Direct - Nolasco

1  Q.      Is that your name at the top of that?

2  A.      That is correct.

3  Q.      And what is this document?

4  A.      This is the Advice of Rights form that was given

5  to Mr. Morris, and that is his signature at the bottom

6  where it says "signature of person making the statement."

7  Q.      I'm going to show you the second page of this

8  document.

9          What's this second page?

10 A.      That is the statement that he wrote.

11 Q.      Is this written in his handwriting?

12 A.      That's correct.

13 Q.      At any point in the statement, does he make

14 mention of riding his bicycle in the street?

15 A.      Correct.  Right at the end, he says that he got

16 off balance and proceeded -- veered into the road into

17 oncoming traffic in front of a vehicle, and then proceeds

18 to say that that vehicle was an officer.

19 Q.      At any point in your questioning of Mr. Morris,

20 did he ever state that he wished to speak with an

21 attorney?

22 A.      No, sir.

23 Q.      Did he seem to understand all the rights that you

24 presented him with, with the Advice of Rights form?

25 A.      Yes, sir.

Cross - Nolasco

1    Q.      One moment please, Your Honor.

2            No further questions at this time, Your Honor.

3            THE COURT:  All right.  Cross.

4            MS. JOHNSON:  Thank you, Your Honor.

5                    **CROSS-EXAMINATION**

6            BY MS. JOHNSON:

7    Q.      Court's indulgence.

8            Good morning, Officer Nolasco.

9    A.      Good morning, ma'am.

10   Q.      You said you've been an officer for four and a

11   half years; is that correct?

12   A.      Close.

13   Q.      Have you been with Prince George's County that

14   entire time?

15   A.      Yes, ma'am.

16   Q.      Were you wearing a badge the night of September

17   10th 2009?

18   A.      I believe so.

19   Q.      And the government was asking you a number of

20   questions on your experience in that area of 5701 Walker

21   Mill Road, but I want to focus your attention on your

22   experiences prior to September 10th 2009, prior to

23   Mr. Morris' arrest.

24   A.      Okay.

25   Q.      Prior to that time, had you had experience

Cross - Nolasco

1  patrolling that particular neighborhood?

2  A.      Yes.

3  Q.      And for how long?

4  A.      For about -- I want to say -- was it '09?  About

5  two years.

6  Q.      And how many arrests had you made in the area of

7  5701 Walker Mill Road as of September 10th 2009?

8  A.      I don't know.

9  Q.      Could you say if it was more than ten?

10  A.      Right on 5701?  None.

11  Q.      And so you don't recall that you had made any

12  particular arrests in that specific area as of September

13  10th 2009.

14  A.      No.  I do not recall, ma'am.

15  Q.      Okay.  How familiar would you say you were with

16  that block as of September 10th 2009?

17  A.      Pretty familiar.  You hear the calls coming over

18  the radio all the time.

19  Q.      Okay.

20  A.      And we patrol there all the time.

21  Q.      Okay.  But I'm asking about your particular

22  experience.  Not the department in general, but your

23  particular experience.

24  A.      Oh.  That would be my particular experience,

25  ma'am.  We have responded to many calls there.

Cross - Nolasco

1    Q.      Do you recall that when you first called in your

2    stop of Mr. Morris that you gave a different location?

3    A.      That is correct.

4    Q.      Do you recall that you gave an address of 5701

5    Spring Mill Road; is that correct?

6    A.      Either that or Silver Hill, one of the two.

7    Q.      And there was -- there was some exchange there on

8    the KGA communications trying to clarify your exact

9    location; is that correct?

10   A.      That's right.

11   Q.      The dispatcher was asking you if there were any

12   stores in your area?

13   A.      That's correct.

14   Q.      Finally, after a little bit, you were able to

15   identify your correct location; is that correct?

16   A.      Mm-hmm.   "Yes"

17   Q.      The original location that you gave is over a mile

18   away from the location where you actually were; is that

19   correct?

20   A.      That is correct.

21   Q.      All four and a half years have been with the

22   Prince George's County Police?

23   A.      Yes, ma'am.

24   Q.      And have your duties changed during those four and

25   a half years?

Cross - Nolasco

1  A.      I was in patrol for a year; was in the SAT team

2  for -- ever since then.  I came back to patrol for a few

3  month [sic], and then went right back to the SAT team.

4  Q.      I'm sorry.  Went back to?

5  A.      SAT team.  The Special Assignment Team.

6  Q.      And why was there a break in the Special

7  Assignment Team?

8  A.      Just the way the rotation happens.

9  Q.      Now, you indicated that at -- on September 10th

10 2009, you saw Mr. Morris riding his bicycle in the road.

11        What direction was -- were you traveling at the

12 time?

13 A.      I was traveling towards Marlboro Pike from Walker

14 Mill.  I'm not sure whether that's north or south.  I

15 believe it's south.  He was traveling the opposite

16 direction towards me.

17 Q.      Okay.  So, he was traveling away from Marlboro

18 Pike?

19 A.      Yes.

20 Q.      And you were traveling -- okay.  There were no

21 other vehicles on the road at the time, other than your

22 vehicle and Mr. Morris' bike; is that correct?

23 A.      That's correct.

24 Q.      Now, you said you saw him sort of crossing lanes.

25        Did he actually cross the center line, or was he

Cross - Nolasco

1   sort of weaving in between the lanes on the side of the

2   road?

3   A.      Yes.   He crossed the center line.

4   Q.      Now, when he crossed, he then went up on the

5   sidewalk on the opposite side of the street; is that

6   correct?

7   A.      I believe he crossed in front of me, away from the

8   sidewalk, and then came back to the sidewalk.

9   Q.      I'm sorry.   I'm not understanding the sequence.

10  A.      So, he crosses that way.   (Indicating.)   Right?   I

11  almost strike him.   He keeps going.   Then he comes back

12  to the sidewalk.   So he actually crossed the double

13  yellow line in order to avoid me, and I had to actually

14  veer towards the closer side of the sidewalk in order to

15  avoid him.

16  Q.      Which side of the roadway was he on when he

17  crossed in front of your vehicle?

18  A.      Well, first -- the first time he -- I saw him come

19  off the sidewalk, cross the double yellow line, and come

20  back this way.   As I'm approaching him, he once again

21  goes across the double solid yellow line right where I

22  almost struck him.   And I got to veer off towards the

23  sidewalk, and then he comes back to the sidewalk.

24  Q.      Behind your vehicle?

25  A.      Behind my vehicle.   Correct.

Cross - Nolasco

1   Q.      And then he was on the sidewalk when -- after you

2   had made your U-turn and pulled up next to him; is that

3   correct?

4   A.      Yes.  Once I made the U-turn and pulled up next to

5   him, he was on the sidewalk.

6   Q.      And you activated your lights, and Mr. Morris

7   stopped at that point; is that correct?

8   A.      That's correct.

9   Q.      Okay.  And he had his feet down on the ground?

10  A.      Mm-hmm.  "Yes."

11  Q.      Did he dismount the bicycle, or was he straddling

12  it at that point?

13  A.      No.  He was straddling it at that point.

14  Q.      When you rolled your window down, what distance

15  would you say you were from Mr. Morris at that time?

16  A.      Pretty close.  Maybe 4' or 5'.

17  Q.      When you asked him, "You okay?", do you recall him

18  saying, "I'm fine?"

19  A.      No.

20  Q.      And when you asked for identification, do you

21  recall him saying that he indicating that he did have

22  identification and starting to reach for his pocket?

23  A.      No.

24  Q.      Now, in your arrest report, which has been marked

25  as I think Government's Exhibit No. 3 -- do you recognize

Cross - Nolasco

1  this document?

2  A.      That's correct.

3  Q.      Okay.  And who was responsible for completing this

4  document?

5  A.      I am.

6  Q.      And this narrative down here.  Did you have any

7  conversations with anyone before completing this

8  narrative?

9  A.      No, ma'am.

10 Q.      Directing your attention to about eight lines

11 down.  It says that you attempted to conduct a pat down

12 for weapons.

13         Do you see that?

14 A.      Mm-hmm.  "Yes."

15 Q.      And what was the -- and your determination at this

16 point was based on the fact that you felt that

17 Mr. Morris was not being very responsive and that he was

18 wearing a jacket that you believe was not weather

19 appropriate; is that correct?

20 A.      Mm-hmm.  "Yes."

21         COURT REPORTER:  Can you say "yes" or "no,"

22 please?

23         THE WITNESS:  Yes.

24         COURT REPORTER:  Thank you.

25         BY MS. JOHNSON:

Cross - Nolasco

1  Q.      When you attempted to conduct the pat down, you

2  actually made physical contact with Mr. Morris at that

3  point; is that correct?

4  A.      Possible.  Yes, ma'am.

5  Q.      And did you feel anything at that time, when you

6  made that initial contact with Mr. Morris?

7  A.      I don't recall.

8  Q.      So you don't recall feeling any bulges or --

9  A.      It's possible.  Like I said, everything happened

10  quite quick.

11  Q.      And then you say that you began to open up the car

12  door, and at that point Mr. Morris -- you said he's

13  straddling the bicycle.  Explain to me --

14  A.      He's straddling the bicycle.  I came out of the

15  vehicle the same time the bike is coming at me.  I might

16  have made contact with him; I don't recall.

17  Q.      And you say that he then took off, you said, about

18  -- I think about 15' to 20'?

19  A.      That's correct.

20  Q.      And you thought maybe that took about a minute?

21  A.      Sort of.

22  Q.      Now, if I direct your attention to the tabbed

23  sheet -- I apologize.  I don't have this marked.  If I

24  could get this marked as Defense Exhibit 1.

25          Handing you what's been marked as Defense Exhibit

Cross - Nolasco

1  No. 1.

2  A.       Mm-hmm.   "Yes."

3  Q.       Have you seen this document before?

4  A.       Yes, ma'am.

5  Q.       Okay.   What is it, please?

6  A.       It's a CAD sheet.   It shows the call for service

7  which I called out with.

8  Q.       And this reflects when you were calling in your

9  stop with Mr. Morris; is that correct?

10 A.       That's correct.

11 Q.       So it looks like at 1:36:08.   So, it's 1:36 in the

12 morning?

13 A.       Mm-hmm.   "Yes."

14 Q.       You're calling in that you've stopped someone on

15 the bike; is that correct?

16 A.       That's correct.

17 Q.       And then at 1:36:38, you're calling in that you

18 have one in custody; is that correct?

19 A.       That's correct.

20 Q.       So, that's 30 seconds later?

21 A.       Mm-hmm.   "Yes."

22 Q.       Right.   Now, you said when you had Mr.- -- I'm

23 sorry.   Backing up.   The clothing that Mr. Morris was

24 wearing.   You said it was a North Face jacket.   That was

25 a fleece jacket; correct?

Cross - Nolasco

1  A.      North Face jacket, ma'am.  Sort of like a big

2  coat.  I don't know.

3  Q.      Well, North Face makes a number of jackets.  I'm

4  just trying to clarify was it a fleece jacket?  Was it,

5  like, a solid jacket?  What kind of jacket was it?

6  A.      The best I can recall, it was a jacket, a long

7  jacket.  It's black, and he has some red letterings on

8  it.

9  Q.      Do you recall what the weight of the jacket was?

10  A.      No, I do not.

11  Q.      Do you ride bicycles, Officer Nolasco?

12  A.      I'm sorry?

13  Q.      Do you ride bicycles for exercise?

14  A.      No.

15  Q.      You're not familiar, when you're riding 15, 20

16  miles an hour, there is a lot of wind that's generated

17  when you're riding a bicycle?

18  A.      Possibly, yeah.

19  Q.      When you -- you said you found the firearm after

20  Mr. Morris was down on the ground; is that correct?

21  A.      That's correct.

22  Q.      You said you -- I believe you said you reached in

23  to confirm whether or not there was a weapon on his

24  person?

25  A.      Mm-hmm.  "Yes."

Cross - Nolasco

1    Q.      Where exactly did you find the gun?

2    A.      I believe it was on his right side of his body, in

3    his waistband.

4    Q.      In the waistband.

5            And what kind of pants was he wearing?

6    A.      I don't recall.  They were black pants, possible

7    -- I don't know.  Possibly jeans.  Possibly sweats.  I

8    don't recall.

9    Q.      I'm not asking you to speculate.

10           The best you can recall, what kind of pants was he

11   wearing at the time?

12   A.      I couldn't tell you, ma'am.

13   Q.      Was the gun found by itself?

14   A.      No.  It was in sort of like a black holster.

15   Q.      So the gun was in the holster.

16   A.      Correct.

17   Q.      Was the holster fastened?

18   A.      I believe it was.

19   Q.      And was the holster fastened around his waist?  Or

20   was the gun holster tucked into his pants?

21   A.      I believe it might have been just simply tucked in

22   there.  I'm not sure.  I don't remember having to

23   unfasten.

24   Q.      When Mr. Morris was taken into the police station,

25   you weren't the officer who actually advised him of his

Cross - Nolasco

1  rights; is that correct?

2  A.      At the station?

3  Q.      At the station.

4  A.      Yes.

5  Q.      You were?

6  A.      Yes, ma'am.

7  Q.      There weren't two female officers who met with

8  Mr. Morris to advise him of his rights?

9  A.      She might have done it too.

10 Q.      And you weren't with Mr. Morris when he was

11 completing his statement; is that correct?

12 A.      I think I was.  Detective Pettis might have been

13 also there.

14 Q.      You don't recall that there were two female

15 officers who were with Mr. Morris, a Caucasian and an

16 African-American detective who were with him when he was

17 giving his statement?

18 A.      No.  He might have talked to them too.  I'm not

19 sure.

20 Q.      Now, directing your attention to Government's

21 Exhibit No. 1, which you earlier identified as

22 Mr. Morris' written statement.

23 A.      Mm-hmm.  "Yes."

24 Q.      There is no signature here indicating that it's

25 been witnessed by anyone.  Do you see that?

Cross - Nolasco

1  A.      Correct.  Yes, I notice.  But you can see my name

2  clearly on the top, my handwriting.

3  Q.      I understand that.  But this is supposed to be

4  signed by someone witnessing the statement; is that

5  correct?

6  A.      Yes, that's correct.

7  Q.      And on the second page there's a question written.

8          Do you know whose handwriting that is?  It says,

9  "What kind of gun did you find?"

10  A.      That is Officer Pettis -- Detective Pettis'

11  handwriting, I believe.

12  Q.      I'm sorry.  Detective?

13  A.      Pettis.

14  Q.      Is that P-E-T-T-I-S or U-S?

15  A.      Mm-hmm.  "Yes."

16  Q.      And there is no answer reflected.  Do you know why

17  that is?

18  A.      Probably because he didn't want to answer.

19  Q.      Well, I'm not asking you to speculate.  I'm asking

20  you if you know why there is no answer.

21  A.      Because he didn't want to answer.

22  Q.      And is it your testimony that you were in the room

23  at the time that Officer Pettis was asking Mr. Morris

24  that question?

25  A.      Not that specific question.  No.

Cross - Nolasco

1  Q.      So you don't really know what the reason was that

2  there is no answer reflected, since you weren't in the

3  room at that time?

4  A.      It's pretty obvious there is not an answer.

5  Q.      I'm asking you, you weren't in the room at the

6  time that question was asked?

7  A.      Not at the time the question was asked.  No,

8  ma'am.

9  Q.      Now, turning back to Government's Exhibit No. 3.

10 This arrest report that you completed for Mr. Morris.

11 How did you get the -- did you complete this entire form

12 yourself?

13 A.      It's a computer system.  As you put in the

14 information, it generates it for you.

15 Q.      Were you the individual who adds the information?

16 A.      Correct.

17 Q.      No one else entered information on this form?

18 A.      I'm sorry?

19 Q.      There is no one else, other than yourself, who

20 entered information on this form?

21 A.      No, ma'am.

22 Q.      Okay.  Directing your attention to the top of the

23 form.  Up here there's a Social Security number right

24 here.

25         Do you see that?

Cross - Nolasco

1   A.      That's correct.

2   Q.      Okay.  Where did you get that information from?

3   Mr. Morris?

4   A.      I can only guess that it was from him, ma'am.

5   Q.      Well, I'm not asking you to guess.  I'm just

6   asking for your best recollection.

7   A.      From him.

8   Q.      And down here it says, "Narcotics or drug user?"

9   And it says, "Yes.  Marijuana."

10          What is that information based on?

11  A.      I don't recall.  I don't recall.

12  Q.      Okay.  Lastly, a couple of lines further down, it

13  says, "Did the defendant make a statement?"  And it

14  indicates "No."

15  A.      Okay.  Once again, that's from the computer

16  generating the report.  I'm not sure if I forgot to

17  checkmark something.  It could have been anything.

18  Q.      Okay.  But the computer wouldn't generate "No"

19  unless someone inputs "No."

20  A.      No, not necessarily.  If you fail to put "Yes" on

21  a box or something like that, it would generate an

22  automatic answer of "No."

23  Q.      Okay.  At what time was this report completed?

24  A.      I don't remember.  I believe it's on there.  But

25  -- I mean, the arrest happened around 1:36 in the

Cross - Nolasco

1   morning, so I will say probably two, three o'clock in the

2   morning.

3   Q.      It would be after Mr. Morris made his statement;

4   correct?

5   A.      Yes.  Correct.

6   Q.      Court's indulgence, Your Honor.

7           As of September 10th 2009, how many individuals

8   had you arrested who -- on whom you had found weapons

9   concealed beneath heavy clothing?

10  A.      I couldn't really tell you how many.  I'm pretty

11  sure that arrests have been made.  We make gun arrests

12  all the time.

13  Q.      But you can't tell, me as of September 10th 2009,

14  whether you had recovered any firearms from someone

15  wearing heavy clothing; is that correct?

16  A.      No, I couldn't tell you.

17  Q.      Did you take any photos of Mr. Morris at the time

18  of his arrest on the street?

19  A.      Yes, I did.

20  Q.      And where is that photo?

21  A.      There is one of him, actually, on my computer.

22  Q.      Is that the one that you provided to Mr.- --

23  A.      No, it is not.

24  Q.      We would request a copy of that picture.

25          Court's indulgence.

Redirect - Nolasco

1        If I may just --

2        (Discussion off the record between defense

3        counsel and the defendant.)

4        MS. JOHNSON:  No further questions, Your Honor.

5        THE COURT:  Is there redirect?

6        MR. ROSENBERG:  Yes, Your Honor.

7                   **REDIRECT EXAMINATION**

8        BY MR. ROSENBERG:

9   Q.    Officer Nolasco, were there multiple reports

10  generated as a result of this arrest?

11  A.    Yes.  Incident report, arrest report, statement of

12  rights, statement of charges.  I think that covers about

13  all of them.

14  Q.    All right.

15  A.    Property records.

16  Q.    I'm going to show you what's been marked as

17  Government's Exhibit No. 4 and ask you what this report

18  is.

19  A.    Very well.  That is the incident report.

20  Q.    What is the difference between an incident report

21  and the report that you were shown by defense counsel?

22  A.    The incident report is the report that we do for

23  every incident that occurs.  The arrest report is

24  generated usually once you go into the Department of

25  Corrections.

Redirect - Nolasco

1   Q.      Is one report considered more thorough or complete

2   than the other report?

3   A.      Yes.

4   Q.      Which report would be considered the more thorough

5   report?

6   A.      Well, with the new system, it's actually the same

7   probable cause at the back, but in the front his

8   information is going to be -- it should be more

9   consistent.

10  Q.      Now, I'm going to show you Page 2 of this report

11  and ask you if anywhere in this report it notes that

12  Mr. Morris waived his rights and gave a written statement

13  to authorities.

14  A.      Yes.  At the end.

15          THE COURT:  Mr. Rosenberg, I believe that the

16  report, Exhibit No. 3, that has a place noting no

17  statement was made also mentions a statement being made

18  in the narrative.

19          MR. ROSENBERG:  You are correct, Your Honor.

20          BY MR. ROSENBERG:

21  Q.      Officer, as part of the SAT team, are you given

22  training in what neighborhoods are either high crime or

23  safety areas?

24  A.      We are given information prior to us making

25  patrols in those areas.  Yes.

Redirect - Nolasco

1  Q.     I understand you can't remember how many specific

2  arrests you made at this arrest on Walker Mill Road, but

3  is this address at Walker Mill Road part of a larger area

4  or zone?

5  A.     Yes.  It is within the Capitol Heights zone, which

6  is pretty much an area known for violent crimes.

7  Q.     Prior to this arrest, how many arrests had you

8  made in your time at the SAT team in this Capitol Heights

9  area?

10 A.     A lot.  Numerous.

11 Q.     You got to give me a number, though, or an

12 estimated number.

13 A.     I would say probably close to a hundred.

14 Q.     Close or over a hundred?

15 A.     Close to a hundred or so.

16 Q.     How many of those involved firearms?

17 A.     At that time, two and a half years, I would say

18 maybe ten.

19 Q.     Okay.  And in your experience, do people attempt

20 to conceal firearms with larger fitting clothing?

21 A.     Yes.

22 Q.     Is this -- what gave you cause for alarm when you

23 noticed Mr. Morris' clothing?

24 A.     That was one, besides him not answering my

25 questions and so on and so forth.

Redirect - Nolasco

1 Q.     Okay.  And when you say that you attempted to

2 conduct a pat down, did you actually have him stationery

3 while patting him down?

4 A.     No.  I was getting out of my car and moving

5 towards him to attempt to conduct the pat down.

6 Q.     Okay.  So did you ever -- were you ever able to

7 begin the pat down, or did he flee before you were able

8 to begin?

9 A.     No.  That's when he threw the bike and, like I

10 said, I might have made contact with him; I'm not sure.

11 And I believe that I probably did, but not sure.  But at

12 that point, he was already on the run.

13 Q.     Was your contact in the form of patting down his

14 outer clothes or reaching out to grab him when he was

15 attempting to flee?

16 A.     It was both, I would say.

17 Q.     Now, you were shown a copy of the CAD sheet --

18 A.     Yes.  That's correct.

19 Q.     -- and asked about the 30-second difference

20 between one male stopped on a bike and then one male in

21 custody?

22 A.     Correct.

23 Q.     Can you explain why there is only a 30-second

24 difference in that?

25 A.     The first time I called out to give out my

Redirect - Nolasco

1  location.  And at the same time I'm dealing with Mr.

2  Morris and I have people coming, I had somebody else come

3  on a bike at the time that I'm putting him in handcuffs

4  and so on and so forth.  So I'm dealing with a lot of

5  stuff at that point in time.  So, I called out first just

6  to give my location out so that other units in the area

7  knew where I was in case that it went from bad to worse.

8  And then I called again just to make sure that everybody

9  slows down, to make sure that they don't get into an

10  accident trying to find where I'm at.

11  Q.     Did you call out your location, that first

12  printout on the CAD sheet, before or after you had

13  Mr. Morris in handcuffs?

14  A.     That was in -- it was after, I believe.  It was

15  after.  But I was still dealing with the hand gun and a

16  person coming up to the scene.

17  Q.     When you made the U-turn and pulled up to

18  Mr. Morris, did you call that out to the radio?

19  A.     No, I did not.

20  Q.     Why not?

21  A.     I didn't think.  I didn't know what I had.  I

22  didn't want to, you know, call out with something that

23  was nothing, because as far as I was concerned it was

24  simply a citizen.  He could have been drunk.  He could

25  have been anything.  I didn't know what I had yet.

Recross - Nolasco

1      MR. ROSENBERG:  No further questions, Your Honor.

2      THE COURT:  All right.

3      Any recross?

4      MS. JOHNSON:  Just briefly, Your Honor.

5                    **RECROSS EXAMINATION**

6      BY MS. JOHNSON:

7  Q.    Mr. Rosenberg asked you about your training that

8  you had had.  How recent was that training, prior to the

9  night of September 10th 2009?

10 A.    They tell us all the time -- we get reports all

11 the time telling us, okay, these are areas that we need

12 to hit and this is why:  There's been a shooting here.

13 There's been a shooting here, so forth.  That's how we

14 conduct our day-to-day business.

15 Q.    How long had you been patrolling by yourself as of

16 September 10th 2009?

17 A.    Since I graduated FTO.  About -- almost close to

18 two years.

19 Q.    Close to two years as of September 10th 2009?

20 A.    I believe so.

21 Q.    Okay.  I just want to ask you -- I'll mark this as

22 Defense Exhibit No. 2.

23      I'm handing you what's been marked as Defense

24 Exhibit No. 2.  Do you recognize this document?

25 A.    It looks like e-mail?

Recross - Nolasco

1  Q.     Have you ever seen this document before?

2  A.     No, I can't say I have.

3  Q.     Okay.  For the record, it's an e-mail from a

4  Catherine Benedict to a George Hazel and copying a

5  William McMullen.

6         Were you -- did you have any conversations with

7  Ms. Benedict about your arrest of Mr. Morris?

8  A.     I believe I did.  Possible.

9  Q.     Looking a few lines down into this, it indicates

10 that you pulled over and approached "him," referring to

11 Mr. Morris, while being clearly marked as the police by

12 the badge and patches on his vest, uniform.  And "badges"

13 and "patches" is crossed out, and you will see there's

14 handwriting that says, "New.  No badge yet."

15        Do you see that?

16 A.     Okay.

17 Q.     Okay.  Do you know what that's referring to, sir?

18 A.     It's referring to a plastic badge that we usually

19 wear on the top corner of the vest.

20 Q.     Okay.  But why would it be saying, "New.  No badge

21 yet," with respect to you?

22 A.     Probably they didn't have it in the -- on the

23 vest.

24 Q.     Had you been issued a badge as of September 10th

25 2009?

Recross - Nolasco

1  A.      Not a plastic one that goes on the vest.  I have

2  my regular badge inside the vest carrier.

3  Q.      Okay.  And what's the difference?

4  A.      There is really no difference.  It looks exactly

5  the same, except the one goes -- attaches to the vest,

6  and it stays there, while the other one doesn't.  So, you

7  know, you don't want to lose it.

8  Q.      Okay.  So you didn't have a visible badge on you

9  at the time.

10  A.      Okay.

11          MS. JOHNSON:  No further questions.

12          THE COURT:  All right.  You may step down.

13                  (Witness excused at 9:29 a.m.)

14          The COURT:  I'll hear argument on the motion.

15          Thank you, officer.

16          THE WITNESS:  Thank you.

17          MS. JOHNSON:  Well, I think we've got a few

18  problems here with the stop of Mr. Morris.  I think the

19  testimony from Officer Nolasco is clear that he when he

20  approached Mr. Morris he didn't perceive any immediate

21  threat; he didn't even feel a need to call it into his

22  dispatch.

23          And when he approached Mr. Morris on the street,

24  first of all, there was a seizure that occurred as soon

25  as he turned on his lights.  And Mr. Morris submitted to

that show of authority.  But there certainly was -- he,

by his own testimony, said he reached out and attempted

to conduct a patdown and probably believes that he made

contact with Mr. Morris, both in terms of trying to stop

him from going away and also in terms of trying to pat

down for weapons.  And at that point, based on his own

testimony, the reasons for him attempting to conduct a

patdown were that Mr. Morris was not being very

responsive and that he was wearing a jacket that he

believed was not weather appropriate for the time.

        That is simply not sufficient under the case law,

starting with <u>Terry versus Ohio</u> and all the way down to

justify a frisk of Mr. Morris for weapons.  The standard

is very clear.  There has to be --

        THE COURT:  Don't you have a lot more than that

though?  You have a person out late at night in a high

crime area going the wrong direction on a highway,

crossing the line right in the direction where the police

officer had to change his cruiser, potentially

intoxicated or on drugs.  He's violating the motor

vehicle laws.

        And he comes up and says, are you okay?  He asks

for ID, and the reaction is that he throws his bike down

or throws it at the officer and starts to run, and he's

grabbing something in his waistline.  I mean, doesn't

1   that rise well above the standards necessary for both a

2   *Terry* stop as well as probable cause to arrest him?

3         MS. JOHNSON:  Well, let me take that in two parts,

4   Your Honor.  First, we have to focus on what the officer

5   knew at the time that he made the initial stop and

6   patdown of Mr. Morris.  Okay?  The attempt to flee and

7   grabbing his waistband didn't occur until after that, so

8   we'll set that aside for the moment and come back to

9   that.

10         THE COURT:  All that happened before that was he

11   said, "Are you okay?"

12         MS. JOHNSON:  Well, we don't dispute that Officer

13   Nolasco had enough to stop and ask Mr. Morris questions.

14   He had enough to perform an investigative stop.

15         THE COURT:  Correct.

16         MS. JOHNSON:  The case law is clear that that

17   investigative stop has to be limited to the purposes of

18   the stop.  There were some -- arguably, some violations

19   of the vehicle laws although not all the ones that the

20   government cited.  Some of those he clearly wasn't in

21   violation of, and I'll get back to that in a moment.

22         THE COURT:  Well, wrong side of the road and wrong

23   direction; isn't that enough?

24         MS. JOHNSON:  Your Honor, I'm actually not -- if

25   you look at the -- we can stop and focus on that.  The

1   government cites several motor vehicle provisions that

2   they say Mr. Morris was violating.  One was reckless and

3   negligent driving.  That doesn't apply to bicycles.  By

4   its own terms, it only applies to motor vehicles.

5          And in terms of being on the wrong side of the

6   roadway.  There is actually a separate regulation that

7   applies to bicycles with respect to being on the wrong

8   side of the roadway.  I apologize, Your Honor, I'll find

9   it here in a second.  Here we go.  It's 21-1205, Riding

10  on the Roadways or on Highways.  This is a separate

11  provision in terms of riding to the right of the roadway

12  that applies to motor vehicles.

13         It says, "Each person operating a bicycle or motor

14  scooter at the speed less than the speed of traffic at

15  the time and place, and under the conditions then

16  existing on a roadway, shall ride as near to the right

17  side of the roadway as practicable and safe, except when

18  avoiding pedestrians or road hazards," and there are

19  several other exceptions.

20         So, there is a different standard that applies to

21  bicycles with respect to riding on the right side of the

22  roadway, and there are a number of caveats.  You've got

23  to be moving slower than existing traffic.  Well, there

24  was no traffic at the time.  He was the only vehicle on

25  his side of the road at the time.

1       And we also don't know whether he was attempting

2  to avoid road hazards such as, you know, potholes or

3  grates, things like that.  But, admittedly, he was riding

4  without a head lamp.  So there was at least some, you

5  know, violation of a traffic hazard.  Nothing, I would

6  argue, that involves public safety.  But, again, we're

7  not disputing that Officer Nolasco could pull over and at

8  least investigate what he perceived to be this operation

9  of the bicycle.  The problem is what happened after that.

10      It's clear that how the officer conducts that stop

11  has to be limited to the reasons for the stop.  By

12  escalating it into a patdown, there has to be -- he has

13  to have specific reasons for believing that Mr. Morris

14  was armed and dangerous as of that moment.  Okay?

15      So, again, we're before the running; we're before

16  the clutching the waistband.  All we have is an

17  individual riding a bicycle at night wearing what -- he

18  couldn't recall the specifics of the jacket.  He just

19  said that in his opinion it wasn't weather appropriate.

20  Again, we didn't have any testimony about what the

21  weather was even that night.

22      And Mr. Morris is obviously out riding a bicycle.

23  You know, he's exercising -- he's generating a fair

24  amount of wind.  So we don't have great testimony on why

25  his attire is weather inappropriate.  But we have an

1  individual riding a bicycle wearing a jacket who is not

2  immediately responsive when asked a question.  That,

3  taken together, is simply not sufficient to allow an

4  officer to lay hands on a person to conduct a patdown for

5  weapons.  It probably would have been fine for him to ask

6  further questions say, you know, what are you doing out

7  here?  And he continued to ask him questions.  That's

8  what he should have done as to, you know.

9      THE COURT:  He didn't have the opportunity to do

10  that because he threw his bike down and ran.

11      MS. JOHNSON:  After -- that was after Officer

12  Nolasco reached out and made contact with Mr. Morris.

13  And there's no dispute that once he lays hands on

14  Mr. Morris, that's when a seizure has occurred.  Whether

15  or not Mr. Morris broke free -- it's very clear under ha

16  Hadari D. that, you know, no matter how slight, that

17  physical contact constitutes a seizure.  That's the

18  moment we have to look at.  Did he have enough reasonable

19  suspicion to conduct the patdown, the intrusion into

20  Mr. Morris' privacy to pat down for weapons.  Did he

21  have, at that moment, reason to believe that he was armed

22  and dangerous.

23      And by, again, Officer Nolasco's testimony, when

24  he pulled over, he didn't even bother to radio it in.

25  Okay?  His alarm bells certainly weren't raised just by

1   the fact of this person weaving on the road late at night

2   on his bicycle.  And he himself testified that when he

3   reached down, he didn't know what Mr. Morris was

4   referring to when he said, well, you can have it.  You

5   can have it.  And he said, well, he just reached in just

6   to see if there was in fact a weapon.

7        This is not an officer who says, you know, I had

8   reason to believe he had a weapon because I had had an

9   anonymous tip, or because I saw a bulge, or because I saw

10  a person reaching into their pocket.  There is none of

11  that testimony.  The only reason we have for him touching

12  Mr. Morris and attempting to do this initial patdown was

13  based on the lateness of the hour; riding a bicycle in

14  what he described in as erratic matter; wearing a jacket

15  that has not been very well described in the testimony,

16  we don't have any pictures of it.  And him not being

17  immediately responsive to questions.

18        Again, we're not disputing that he could pull over

19  and perform an investigative stop, but it's a separate

20  analysis whether he had specific, individualized reasons

21  to suspect that Mr. Morris was armed and dangerous as of

22  that moment.

23        And, again, we have to look at Officer Nolasco's

24  experience at the time.  He talks about it being a high

25  crime area.  He talks about it in his experience people

1   can hide weapons under heavy clothing, but he couldn't

2   give any specific examples that he, as of that time, had

3   ever arrested someone who had weapons secreted under

4   heavy clothing.  He didn't know the area well enough to

5   give his proper location when he radioed in.  And again,

6   with all respect to Officer Nolasco, I'm not impugning

7   his experiences as an officer.  But in terms of looking

8   at what his experience is, he's been relying on that as

9   part of the analysis.  I think it's relevant to look at

10  what his experience is.

11       In other cases like *Perkins* and *Lender*, where

12  they're talking about officers' experience; they're

13  talking about 20 years of experience in the field or

14  persons who conducted more than, you know, a dozen

15  arrests on this particular block, or they've taken this

16  many calls.  And it's a very specific experience that

17  that officer has.

18       THE COURT:  What's the matter with the notion that

19  the police department is well aware that this is a high

20  crime area and imparts that knowledge to all of its

21  officers to know that this is a high crime area?  You

22  could tell that to a rookie.  And if the rookie is aware,

23  because of what he's been advised by his colleagues that

24  this is a high crime area, the officer can take that into

25  account when he sees suspicious activity.

1      MS. JOHNSON:  Your Honor, there is a certain

2 departmental knowledge.  But Officer Nolasco wasn't even

3 sure where he was at the time.  And we don't have clear

4 testimony of what he considered to be the parameters of

5 this high crime area.

6      THE COURT:  Isn't it understandable?  Something

7 very surprising happens; it's 1 o'clock in the morning

8 and suddenly a bicycle starts coming at you in the middle

9 of the road?  You might not get your map out and note

10 where you are when something surprising like that

11 happens.  That's not remarkable, is it?

12      MS. JOHNSON:  Your Honor, we're not disputing he

13 had authority under Terry versus Ohio to pull over and

14 conduct an investigative stop long enough to ascertain

15 what Mr. Morris was doing and in order to make sure, as

16 he said, that he was okay.  But that's a very different

17 question and analysis as to whether he had --

18      THE COURT:  Well, he did do a *Terry* stop.  That

19 doesn't sound like there is any basis to dispute he did a

20 legitimate *Terry* stop.  And as soon as he started asking

21 questions, the gentleman throws his bike down and starts

22 to run.

23      MS. JOHNSON:  Well, Your Honor --

24      THE COURT:  Isn't that part of the mix when you

25 now talk about reasonable, articulable suspicion?

1        MS. JOHNSON:  Your Honor, going by Officer

2   Nolasco's testimony, he said that he reached out and

3   attempted to conduct the patdown, and he said he probably

4   made contact with Mr. Morris.  Okay?  He couldn't recall

5   exactly, but he said he probably did make contact.

6        THE COURT:  I believe he said he was halfway out

7   of his car when the bike was thrown down and he began to

8   run.  It's kind of hard to do a patdown when you're

9   nearly halfway out of a car.

10        MS. JOHNSON:  Again, Your Honor, we can only go by

11   the testimony in the record.  Officer Nolasco said he was

12   trying to get out, but he also said he was close to the

13   curb.  We don't know whether he reached out through the

14   window and touched him through the window of his car

15   before coming out.  We don't know.

16        All we know is he testified he probably touched

17   him and he made the decision to pat him down based on the

18   evidence that he had available then, which did not

19   include Mr. Morris grabbing at his waistband or

20   attempting to run.  And at that moment -- we have to look

21   at that moment -- he did not have reason to conduct a

22   patdown of Mr. Morris.  And, therefore, it's -- it was

23   impermissible in terms of the statement.

24        THE COURT:  He really didn't do a patdown until he

25   had him at gunpoint.

1        MS. JOHNSON:  But Your Honor, he had a seizure at

2   that moment.  We have to analyze as of the moment the

3   seizure occurred.

4        THE COURT:  You're saying the seizure occurred.

5   He's not even out of his vehicle.  He's halfway out of

6   his vehicle.  He's asking the a fellow, according to his

7   testimony, are you okay?  And instead of responding, the

8   fellow throws his bike down and starts to run.  And

9   you're saying that's a seizure?

10        MS. JOHNSON:  Your Honor, I think there's an

11   argument under Hadari D. that Mr. Morris was actually

12   seized as of the moment that he stopped riding his

13   bicycle and submitted to the show of authority of Officer

14   Nolasco turning on his lights.  So as a threshold matter,

15   even though there was later run that's separate.

16        Hadari D. was analyzing the situation in which

17   there was never a show of authority but the person kept

18   running and had to be forcibly tackled.  That's not the

19   situation we have here.  Here, we have much more

20   analogous to the situation described in Hadari D.where a

21   person -- an officer lays hands on someone and then the

22   person still breaks free.  That still constitutes a

23   seizure.

24        Mr. Morris did submit.  He stopped.  He had his

25   feet on the ground.  He was facing the officer and he

submitted to the show of authority, specifically the

lights flashing on the car.  And he was standing there

and was available for answering questions.  And it was

only after Officer Nolasco had made contact with him that

there was any attempt to flee, but he had already

submitted -- there had already been a seizure, both

because of his submission to authority and also because

of Officer Nolasco touching him.

The case law is very clear that a contact by the

police officer, however brief, however slight,

constitutes a seizure, even if the person then breaks

away.  So, we have -- again, we have to analyze it as of

that moment, not factoring in the grabbing the waistband

and the fleeing that -- that occurred after.  We have to

look at the moment of the submission to the authority

and/or the contact, however slight, with Mr. Morris.

Now, as for the statement.  Our primary argument

is that it's the fruit of the poisonous tree because the

seizure was unlawful because the search was unlawful.

There were statements that sort of flowed from that that

should be suppressed.  But, also, I think there was not

adequate testimony here on the voluntariness of

Mr. Morris' statement.

You know, Officer Nolasco admitted he wasn't in

the room during at least part of the taking of the

1  statement.  He was very unclear in his recollection of

2  who the other officers were.  It was clear another

3  officer was asking a question afterwards, and I just

4  don't think there has been sufficient testimony about the

5  voluntariness about the statement.  But, again, our

6  primary argument is it should be suppressed because it

7  resulted from an unlawful search.

8           THE COURT:  Thank you.  Mr. Rosenberg.

9           MR. ROSENBERG:  Thank you, Your Honor.

10          Your Honor, as to the statement.  There's been no

11  allegations that this was an involuntary statement.  The

12  government showed the Advice of Rights form which clearly

13  explains Mr. Morris' rights and has Mr. Morris' signature

14  at the bottom, and there has just been nothing offered to

15  show this was a coerced or involuntary statement by

16  Mr. Morris.

17          As to the arrest.  I think Your Honor is exactly

18  correct that there was no -- there was no ability to

19  seize.  This isn't a case where Mr. Morris stopped and

20  put his hands on the hood of the car and there was a

21  patdown.  Officer Nolasco, as defense counsel concedes,

22  was justified in turning his car around to talk to

23  Mr. Morris.  It's 1:30 in morning in a high crime area

24  and there is somebody weaving in and out of a four-lane

25  roadway on a bike with no head lamp on.

1      Officer Nolasco is allowed to heighten his

2  suspicion when he begins to speak with Mr. Morris when

3  Mr. Morris won't respond to his questions if he's okay,

4  if he has any ID on him.  And at the moment that Officer

5  Nolasco decides to get out of his car, Mr. Morris flees.

6  Which then, as Your Honor has pointed out, just adds to

7  his reasonable suspicion more articulable facts.  This is

8  more headlong flight, the complete opposite of going

9  about one's business.  And the Fourth Circuit's made it

10 clear in the *Lender* case that officers can take the time

11 of day into account in the reasonable suspicion test.

12 The lateness of the hour may raise the level of suspicion

13 is what L*ender* held, as well as the headlong flight which

14 was mentioned in *Warlow* in the Supreme Court, as well as

15 the high crime area.

16      As Officer Nolasco testified, the SAT Team, the

17 Saturation Team, only patrols high crime areas.  He said

18 that he's made nearly 100 arrests in this area.  So, all

19 of these factors taken together, along with the fact that

20 there was no seizure until Mr. Morris actually submitted

21 to the show of authority and turned around and was

22 handcuffed.  This would all rise to the level of

23 reasonable suspicion.

24      And this -- the officer wasn't required to merely

25 sit in his patrol car while Mr. Morris fled the scene and

1    shrugged his shoulders and did not investigate further.

2    This is precisely what the officer is charged with doing,

3    which is investigating suspicious behavior.  And all

4    these factors on that night did justify this stop, and

5    that's the government's position.  Thank you, Your Honor.

6         THE COURT:  All right.  Anything further?

7         MS. JOHNSON:  No, Your Honor.  I would just put

8    some citations into the record from <u>Terry versus Ohio</u>

9    that, "The scope of the search must be strictly tied to

10   and justified by the circumstance which rendered its

11   initiation permissible."  Again, the moment we're looking

12   at is when the seizure occurred and not -- we shouldn't

13   be factoring in the holding the waistband and the

14   subsequent flight.

15        And again referring Your Honor to Hadari D. case

16   which just cites Terry saying, "When an officer, by means

17   of physical force or show of authority, has in some way

18   restrained the liberty of a citizen, that constitutes a

19   seizure.  A 'seizure' refers to any application of

20   physical force, even if it's ultimately unsuccessful."

21        THE COURT:  Ms. Johnson, I'm not recalling the

22   testimony quite the way you are in terms of him touching

23   him.  My recollection of the testimony, perhaps I'm in

24   error, is that he testified that he made a U-turn, came

25   up where he could talk to him from his driver's door

1  window and asked him if he was okay, and apparently asked

2  for ID.  Got neither.  No response to either one of

3  those.  And then he started to exit his vehicle and the

4  defendant threw down his bike, or "threw it at him," as

5  my notes say, and ran.  So I'm not sure where the seizure

6  is in that very rapid fire series of events, which is

7  followed by him fleeing and holding his waistband, and

8  he's fleeing.  I just don't understand factually where

9  you're coming from.

10       MS. JOHNSON:  Well there's two components, Your

11  Honor.  One is there is a seizure the moment Mr. Morris

12  submitted to Officer Nolasco.

13       THE COURT:  That's after he had a gun pointed at

14  him, yes.

15       MS. JOHNSON:  No.  When he pulled up with the

16  lights flashing and Mr. Morris stopped riding his

17  bicycle, he didn't continue riding his bicycle.  He

18  stopped.  He turn around.  He had his feet planted on the

19  ground.

20       THE COURT:  You're saying that's a seizure --

21       MS. JOHNSON:  Correct.  Correct.  He was

22  submitting to a show of authority at that point.  The

23  other prong of the analysis at that point, Your Honor, is

24  there was a seizure when Officer Nolasco actually made

25  physical contact with Mr. Morris.  I submit, though,

1 there is some tension in his testimony.  But, again, all

2 we can go by is Officer Nolasco's testimony.

3          THE COURT:  I'm not sure I recall the testimony

4 the way you do.

5          MS. JOHNSON:  Your Honor, when I asked him -- when

6 I focused his attention on the his arrest report and his

7 language that he had attempted to conduct a patdown, I

8 asked him specifically if he had made physical contact.

9 He said he's not -- he wasn't sure, maybe he did.  And

10 further redirect by the government said, well, when you

11 said that you may have made physical contact, was that in

12 the context of trying to stop him from running away or

13 actually trying to pat him down for weapons?  He said,

14 well, I think it was both.  I probably believe I did

15 touch him.  That's his testimony.  At least that's my

16 best recollection of his testimony.

17          It's certainly not unambiguous.  But, I think,

18 given the opportunity, his best recollection is that he

19 probably did touch Mr. Morris, both in the context of

20 trying to restrain him from leaving and in trying to pat

21 down his garments for clothing.  He didn't recall whether

22 he actually felt any items during that brief little

23 patdown that he was able to make.

24          So, Your Honor, that's our submission is that that

25 contact, however brief, constituted a seizure under

1  Hadari D. and was not -- it was not authorized by the

2  circumstances then known to Officer Nolasco.  And a

3  reasonable officer at that time wouldn't have determined

4  that there was a basis to do a patdown for weapons.

5       THE COURT:  Okay.  All right.  In this case we

6  have a circumstance in which the defendant is riding a

7  bicycle and weaving in a four-lane road and going onto

8  the wrong side of the road and going in the wrong

9  direction on the wrong side of the road, and it led to

10 this officer making a U-turn and coming up to him and

11 asking him is he okay, which would be, obviously, a

12 legitimate inquiry when it's very late at night and

13 somebody is driving erratically.

14      Ironically, I note that my hopefully future

15 colleague Judge Ellen Hollander, who is anxiously

16 awaiting Senate confirmation, wrote an opinion for the

17 Court of Special Appeals in Cox versus State in 2005

18 inviting a bicycle stop just like this one; that's in 871

19 Atlantic 2d, 647.  She made the same kind of observations

20 concerning riding a bicycle the wrong way on a one-way

21 street and indicated that the officer's clearly probable

22 cause to effect a stop based on that traffic violation.

23      I don't believe, under the circumstances of this

24 case, that simply turning the cruiser around, turning the

25 lights on and asking a person, "Are you okay?" amounts to

1  a seizure.  It was a legitimate traffic stop.  And when

2  the officer made inquiries to the defendant, he behaved

3  very unusually by throwing down his bike -- my notes

4  indicate "throwing it at him."  But, in any event,

5  throwing his bike down and running.  And running in a

6  suspicious manner, holding onto his waistband where,

7  ultimately, what the officer's suspicion was turned out

8  to be true, that it was a fully loaded .40 Caliber Glock

9  revolver.

10        The testimony is minimal in terms of any notion of

11  physical force being applied on this defendant before he

12  had a chance to run.  There was a rapid series of events,

13  and I'm not going to get into parsing them to the level I

14  believe that the defendant is trying to do.

15        This is an officer who has testified that he was

16  halfway out of his cruiser.  He wasn't even all the way

17  standing on his feet when the bicycle got thrown down.

18  How he can do a patdown or make any significant contact

19  such as to constitute a seizure when he's only halfway

20  out of a cruiser is beyond me.

21        It's clear that -- and I credit the testimony of

22  this officer that he made an inquiry as to whether he was

23  okay, and he got no response.  Same thing with regard to

24  requesting identification and that as he starts to get

25  out, the gentleman throws the bike down and runs.

1        And so I, first of all, have a serious question as

2    to whether that could be considered a seizure under any

3    circumstances.  It's clear, and it's hard for the defense

4    to argue otherwise, that there was probable cause to

5    believe that he had committed traffic violations, as was

6    clearly found by my future colleague Judge Hollander in

7    the *Cox* case.  That is sufficient to effect the traffic

8    stop in this case.

9        Ultimately, this defendant was stopped at the

10   point of a gun when he ran.  Under all of these

11   circumstances, holding -- clutching his waistband.  And

12   clearly when you have the circumstance of unprovoked

13   flight, which is what we have here, that's a significant

14   factor to take into account, together with all the other

15   circumstances of this case; the late night, the dark

16   clothing, the high crime area.  And that would justify

17   stopping and briefly detaining a person for investigative

18   purposes.

19       Under all of the circumstances, I conclude that

20   this arrest was entirely properly under Terry versus Ohio

21   and all the other cases that have been cited today.

22       With regard to the motion to suppress statements.

23   I do not conclude that the securing of the statement from

24   this gentleman was the product of an unlawful arrest or

25   seizure.  And with regard to the circumstances under

1   which the statement was made, it's clear that the

2   defendant was provided, in writing, all of the warnings

3   required by <u>Miranda versus Arizona</u> that he initialled the

4   appropriate responses.  He gave a voluntary statement.

5          I find that the statement was not only in

6   compliance with *Miranda* but also was voluntary.  For

7   those reasons I will deny the defendant's motion to

8   suppress evidence and the motion to suppress statements,

9   which are docket entries 26 and 27.

10         Thank you.

11                (Off the record at 9:56 a.m.)

12

13                    <u>**CERTIFICATE**</u>

14         I, Tracy Rae Dunlap, RPR, CRR, an Official Court
    Reporter for the United States District Court of
15  Maryland, do hereby certify that I reported, by machine
    shorthand, the proceedings had in the case of UNITED
16  STATES OF AMERICA versus MARCUS MORRIS, Criminal Action
    Number RWT-10-029 on October 20, 2010.

17
           In witness whereof, I have hereto subscribed my
18  name, this 25th day of October 2010.

19
                        __/S/__Tracy Rae Dunlap___
20                      TRACY RAE DUNLAP, RPR, CRR
                        OFFICIAL COURT REPORTER
21

22

23

24

25